FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

Nov 20, 2023

SEAN F. MCAVOY, CLERK

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

JUSTIN BAKER,

Plaintiff,

v.

UNITED PARCEL SERVICE INC.,

Defendant.

NO. 2:21-CV-0162-TOR

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

BEFORE THE COURT is Defendant's Motion for Summary Judgment (ECF No. 47) and Defendant's Motion to Strike (ECF No. 58). These matters were submitted for consideration with oral argument on November 16, 2023. Naomi Beer and Jacob M. Knutson appeared on behalf of Defendant. Thomas G. Jarrard appeared on behalf of Plaintiff. The Court has reviewed the record and files herein, considered the parties' oral arguments, and is fully informed. For the reasons discussed below, Defendant's Motion for Summary Judgment (ECF No. 47) is GRANTED, and Defendant's Motion to Strike (ECF No. 58) is DENIED as moot.

**BACKGROUND**

This matter arises out of alleged violations of the Uniform Service Employment and Reemployment Rights Act 38 U.S.C. § 4311(b) ("USERRA") and the Washington Law Against Discrimination RCW § 49.60.210 ("WLAD") based on alleged retaliation for filing a class action lawsuit (2:21-CV-0114-TOR) for harassment and discrimination in the workplace. Plaintiff has been employed with United Parcel Service (Defendant) in Spokane as a package delivery driver since 2007. ECF No. 54-1 at 2, ¶ 1. He is also a member of the U.S. Army, serving in active duty from 2010 to 2013, and has since joined the U.S. Army Reserves. *Id*.

Plaintiff alleges that he has experienced a pattern of hostility in the workplace at the hands of his managers. His first allegation of discriminatory behavior stems from his return from a two-week Army Reserve related training, and asserts the conduct occurred from late February until early March 2020. ECF No. 54-1 at 2, ¶ 2. He alleged that upon his return and after he had worked the full day, Lori Olson, Defendant's general manager, called him twice after working hours and threatened him regarding his return to work. *Id*. at 3, ¶¶ 4, 5. Plaintiff stayed home for the following three days without pay. *Id*., ¶ 5. Defendant asserts that Plaintiff was sent home without pay for three days because he had returned from his Army Reserve training in Japan, and the company had pandemic related

health and safety concerns. ECF No. 57 at 8. Plaintiff alleges that on March 19, 2020, after he returned from the unpaid leave, he was called into a meeting with managers Olson and Robert Fischer, and Kevin Cruz, a union representative, where he was informed that a termination investigation had been opened. ECF No. 54-1 at 4-5, ¶¶ 8, 9.

On March 19, 2020, Plaintiff filed a USERRA complaint against Defendant based on his treatment by management. *Id*., ¶ 10. He also filed a grievance on March 20, 2020. *Id*., ¶ 11. The Department of Labor ("DOL") notified Olson about the USERRA complaint on March 23, 2020. *Id*., ¶ 12. DOL ultimately found Plaintiffs allegation to be credible and determined that Defendant was not in compliance with USERRA. ECF No. 54-20 at 3.

A meeting was held on March 31, 2020, where management, Plaintiff, and a union representative discussed the grievance filed. ECF No. 54-1 at 4, ¶ 13. Plaintiff asserts that during that meeting, hostile language was directed at him, and he left with the impression that his termination investigation was still ongoing. *Id*. at 4-6, ¶¶ 13, 14.

Plaintiff alleges that he filed another grievance on July 31, 2020, after being threatened with punishment for not bringing his military identification to work in order to access Fairchild Airforce base. *Id*. at 6, ¶ 15.

In February 2021, Plaintiff notified Defendant of the underlying class action lawsuit (2:21-CV-0114-TOR), which he filed on March 16, 2021. *Id*., ¶¶ 17, 18. Plaintiff asserts that thereafter, employees approached him about the lawsuit during the workday. *Id*., ¶ 19. Manager Fisher asserted that conversations had taken place about the lawsuit among management, including Curtis Wentler, the Health and Safety Manager for the Northwest District. ECF No. 48 at 5, ¶ 15. Wentler oversees the 63 centers across the Northwest and works from an office located in Pacific, Washington. ECF No. 51 at 3, ¶¶ 6,7. Defendant disputes that Wentler had any knowledge of Plaintiff on a personal level, including his military status, the lawsuit, and underlying complaints lodged against Defendant during the relevant period. ECF No. 47 at 11.

On March 22, 2021, Plaintiff suffered a back injury while on the job. ECF No. 54-1 at 9, ¶ 23. As part of the National Master United Parcel Service Agreement, the collective bargaining agreement, ("CBA"), he filed a request for a temporary alternative work ("TAW"), which would allow him to continue working within the bounds of his injury. *Id*., ¶¶ 23, 24.

Plaintiff returned to work on March 23, 2021, but his condition deteriorated, and he went to the doctor on March 29, 2021. *Id*. at 10, ¶¶ 28, 29. Per the direction of the doctor, Plaintiff returned to work on March 30, 2021, and was

placed on TAW performing light duty which amounted to paperwork in the breakroom. *Id.*, ¶ 29.

Plaintiff and Defendant dispute what occurred while Plaintiff was working under the TAW. Plaintiff asserts that a company health advisor informed managers in Spokane that he was "struggling with staying in his restrictions while performing driving activities." *Id.* at 11, ¶ 30. According to Plaintiff, he never reviewed light duty works options with his managers despite the recommendations of the health advisor. *Id.*, ¶¶ 30, 31. Instead, Plaintiff argues, managers conspired to have Wentler remove Plaintiff from TAW and place him on "lost time." *Id.*, ¶ 33. Plaintiff alleges that on April 1, 2021, he was called into the Fisher's office for a meeting with shop steward Andrew Bagley. *Id.* at 12, ¶ 34. According to Plaintiff, during this meeting Fisher informed him that there was no light duty work available for him to perform, and thus he would be placed on disability without pay for three days until he could be placed on L&I. While placed on "lost time," Plaintiff received 60% pay until released back to full time work. *Id.*

Defendant agrees with the assertion that Plaintiff was injured while working which resulted in neck and back pain, and the fact that a doctor placed a light work restriction on him. ECF No. 48 at 2, ¶ 5. Defendant argues that Plaintiff was moved from light work that required him to drive, to office work, because turning to look for traffic caused him pain. *Id.* at 4, ¶ 11. According to Defendant, a

company health advisor informed managers that Plaintiff had pain in his neck and that they should review light duty option with him.  *Id*. at ¶ 12.  Manager Fisher replied that Manager Mandy Hopper had developed a TAW safety training course that they would have Plaintiff complete in order to stay within the restriction.  *Id*., ¶ 13.  Defendant argues that Plaintiff was reassigned to complete the TAW safety training course consisting of paperwork, writing, and answering questions on March 31, 2021.  *Id*. at 5, ¶¶ 13, 14.  However, according to Defendant, on April 1, 2021, Plaintiff informed Manager Hopper that completing the safety training course was causing him pain.  *Id*., ¶ 14.  Defendant alleges that, upon Hopper's report to Wentler that completing the light work tasks assigned caused Plaintiff pain, Wentler, and notably not any local managers, removed Plaintiff from TAW and moved him to "lost time" on April 1, 2021.  *Id*. at 6, ¶¶ 20, 21.

There is also a dispute between parties about the guarantee of the TAW. Plaintiff argues that employees are guaranteed by practice a full 30 days of TAW. ECF No. 54-1 at 10, ¶ 25.  Defendant argues that employees may receive up to 29 days of TAW, but that there is no guarantee that the employee will receive the entire benefit.  ECF No. 48 at 3-4, ¶ 9.  Further, Defendant alleges that in order to receive the TAW, light work that does not cause further injury must be available. *Id*., ¶ 10.

The Parties do not agree on the specifics of how Plaintiff's return to work took place. Defendant alleges that Plaintiff attempted to return to work on May 6, 2021 and was initially denied by Wentler because he did not receive a release note from the doctor who originally restricted his work. *Id*. at 8, ¶ 31. According to Defendant, once the company received clarification that Plaintiff's treating physician had changed and he was therefore released to work on Friday, May 21, 2021, Plaintiff was permitted to return to work on Monday, May 24, 2021. *Id*. at 9, ¶ 35. Plaintiff disputes this characterization and claims that Fisher denied his return to work on May 6, 2021. ECF No. 54-1 at 15. ¶ 6. Similarly, Plaintiff asserts that it was Fisher, rather than Wentler, who refused to allow him to return to work without a doctor's note from his treating physician on May 21, 2021. *Id*. at 16, ¶ 47.

During the relevant period, Wentler stated that he had no knowledge of the class action lawsuit while he was making decisions about Plaintiff's leave status.

> At the time I removed Mr. Baker from TAW, I had no knowledge that Mr. Baker had filed a class action lawsuit (or had made any other claim at any time) against UPS.

ECF No. 51 at 5, ¶ 16.

> At the time Mr. Baker presented his second note (on May 21, 2021) and then returned to work (on May 24, 2021), I still had no knowledge Mr. Baker had filed a class action lawsuit against UPS, and I also did not know that Mr. Baker had filed this lawsuit.

ECF No. 51 at 7, ¶ 28.

Additionally, it appears the conversation among managers about Plaintiff's class action lawsuit took place after he had been removed from TAW as Fisher in his deposition stated the following:

> Q. Did you ever discuss Justin Baker's USERRA complaints with Ms. Olson?
>
> A. USERRA complaint?
>
> MR. KNUTSON: Object to form.
>
> Q. (BY MR. JARRARD:) USERRA complaints, his complaints about discrimination or retaliation because of his military service.
>
> A. No.
>
> MR. KNUTSON: Object to form.
>
> THE WITNESS: No. Um –
>
> Q. (BY MR. JARRARD:) Go ahead.
>
> A. The day that the union steward told me he was suing the company, I went down to her office and said, "Hey, is Baker suing the company?" And she said, "Yeah, but I'm not supposed to talk about it." And I said, "Okay. Anything I'm doing wrong that I need to be aware of?" She said, "No," and that was the extent of the conversation.
>
> Q. Okay. Now, was that in -- that was in 2021, before -- or –
>
> A. That would have been right around the same time as the whole injury, chiropractor note, all that stuff.
>
> Q. Okay. And who is the shop steward that told you about –

A. Shawn Ohland. O-h-l-a-n-d.

Q. What did he tell you?

A. Oh, it was weird, because it was kind of awkward. **They -- he and Andrew Bagley were talking to me about Justin wanting to come back to work, and I'd already told him no**. And I said something like, "Yeah, not my call, and **he's going to stay on lost time."** And Shawn Ohland said, "Well, that's another lawsuit." And Bagley kind of looked at him like shut your mouth, and then we quit talking about it.

Q. And Shawn Ohland, who is he again?

A. Union steward. Both of them were union stewards, meaning they're paid by UPS, they're drivers, but they were the stewards that would bring in -- collect grievances, bring them in.

Q. Did you talk to anyone else about – aside from your lawyers –

A. Uh-huh.

Q. Did you talk to anybody else at UPS about Justin's lawsuit?

A. With what I remember, I would have talked to Lori Olson, Mandy Hopper, Curtis Wentler, Jesse Flamand. Probably would have talked to at least his supervisor, if not all three supervisors in that center.

Q. Who's Curtis Wentler again?

A. He is the health and safety manager for the district. Or was. I don't know if he's still doing that or not.

ECF No. 54-5 at 3-6 (emphasis added).

Plaintiff brought the present action on May 14, 2021, and filed an amended complaint on July 1, 2021, alleging that Defendant violated his rights under the USERRA and WLAD by retaliating against him for bringing the underlying

punitive class action lawsuit. ECF No. 7 at 1-2. Defendant filed this motion for summary judgment on August 4, 2023, asserting that Plaintiff did not offer proof that Wentler, the ultimate decisionmaker, possessed the requisite knowledge of the punitive class action lawsuit when he removed Plaintiff from TAW, and even if he had, that it was done for a non-discriminatory reason. ECF No. 47 at 6. Defendant also moves for summary judgment with respect to the award of damage scheme Plaintiff posits under the collective bargaining agreement. *Id*. at 8. Plaintiff filed a response in opposition. ECF No. 54.

Additionally, Defendant filed a motion to strike certain declarations attached to Plaintiff's response in opposition to summary judgment. ECF No. 58. Plaintiff filed a response in opposition. ECF No. 61.

## DISCUSSION

### I. Motion for Summary Judgment

Here, the Court finds that Plaintiff has not produced sufficient evidence to suggest that Wentler, the decisionmaker, had knowledge of Plaintiff's class action lawsuit.

Summary Judgment Standard

The Court may grant summary judgment in favor of a moving party who demonstrates "that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In ruling

on a motion for summary judgment, the court must only consider admissible evidence. *Orr v. Bank of America*, NT & SA, 285 F.3d 764, 773 (9th Cir. 2002). The party moving for summary judgment bears the initial burden of showing the absence of any genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the non-moving party to identify specific facts showing there is a genuine issue of material fact. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id*. at 252.

For purposes of summary judgment, a fact is "material" if it might affect the outcome of the suit under the governing law. *Id*. at 248. Further, a dispute is "genuine" only where the evidence is such that a reasonable jury could find in favor of the non-moving party. *Id*. The Court views the facts, and all rational inferences therefrom, in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). Summary judgment will thus be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

A. USERRA

USERRA's purpose is to protect members of the military in the workplace

by prohibiting discrimination against them because of their service. *Leisek v. Brightwood Corp*., 278 F.3d 895, 898 (9th Cir. 2002). To make a claim under USERRA, an employee must show that military service was a motivating factor behind an employer's negative action against the employee. 38 U.S.C. § 4311(c)(1). Courts have interpreted USERRA to require an employee to bear the initial burden of showing that military status was motivating factor in an adverse employment decision, and then the burden shifts to the employer to show that it would have taken the same action without regard to a protected activity. *Leisek,* 278 F.3d at 899 (citing *NLRB v. Transportation Management Corp*., 462 U.S. 393, 401 (1983)). Military status is considered a motivating factor if the defendant "relied on, took into account, considered, or conditioned its decision on that consideration." *Coffman v. Chugach Support Servs., Inc.,* 411 F.3d 1231, 1238 (11th Cir. 2005).

Hostility toward military status can be shown as a motivating factor for a negative employment action by inference through a variety of factors including: the amount of time between the military activity and the adverse employment action; inconsistency between reason given for the negative employment activity and actions taken by the employer; an employer's expressed hostility toward employees who are members of the military with knowledge of the employee's service; and disparate treatment of similarly situated employees. *Sheehan v. Dep't*

*of Navy*, 240 F.3d 1009, 1014 (Fed. Cir. 2001).

Summary judgment is proper because Plaintiff offers no evidence to support his contention that Wentler, the ultimate decisionmaker, knew of Plaintiff's underlying lawsuit when the decision was made to remove Plaintiff from TAW. Plaintiff walks through several of the inference factors as described in *Sheehan*, discussing his negative interactions with management at the Spokane facility as evidence of a pattern of hostility.  He describes interactions with Olson and Fisher after he returned from training in February 2020 and was threatened with a termination investigation, the meeting on March 31, 2020, in which Plaintiff had a tense exchange with management, and the additional grievance he filed for pressure to use his military identification.  ECF No. 54 at 6-7.  Notably absent is a demonstration that Wentler was aware of any of this conduct.

In support of the proximity in time factor, Plaintiff points to the sequence of events between the time he filed the punitive class action lawsuit on March 16 until he ultimately reinstated on May 24, 2021.  ECF No. 54 at 9-13.  Specifically, Plaintiff argues that Manager Fisher learned of Plaintiff's class action lawsuit "at the same time" as he was removed from TAW, and told other managers, including Wentler.  *Id.* at 9.  However, neither Fisher nor Wentler's individual testimony supports this contemporaneous view of events.  Wentler denies knowledge of the class action lawsuit outright.  ECF No. 51 at 5, 7 ¶¶ 16, 28.  And, while devoid of a

specific date, Fisher's testimony suggests that he did not even learn of the lawsuit, nor did he tell colleagues, until after Plaintiff was removed from TAW. ECF No. 54-5 at 4-5 ("They – [Shawn Ohland] and Andrew Bagley were talking to me about Justin wanting to come back to work, and I'd already told him no. And I said something like, 'Yeah, not my call, and he's going to stay on lost time.'"); ECF No. 54-4 at 39 (Recounting that he received notice of Plaintiff's grievance filed after he was removed from TAW "I don't remember being aware of the lawsuit at that time.") Further, Plaintiff offers no evidence other than Fisher's statement that "[w]ith what I remember, I would have talked to Lori Olson, Mandy Hopper, Curtis Wentler, Jesse Flamand" once he learned of the lawsuit to corroborate when these conversations took place. *Id*. at 5.

Further, Plaintiff argues that the class action lawsuit was used in a discriminatory fashion to deny him clearance to return and/or use additional TAW days. ECF No. 54 at 11-12. Plaintiff asserts that it was Fisher who denied his return, but, as even Fisher noted in his deposition, Wentler had the authority to approve or deny return. ECF No. 54-4 at 20 ("[I]f I submitted a document that says Justin Baker is being moved to lost time, that doesn't mean I'm right. That doesn't mean I have the authority to do that. That actually has to be approved by health and safety. Neither Lori Olson, nor I, have the direct authority to put him on lost time or take him off lost time."). And, though he has attested otherwise, even

if Wentler had knowledge of the lawsuit when he made the decision to return Plaintiff to work after removal from the TAW, Defendant has met its burden in offering a non-discriminatory reason for the initial denial. Namely, that requiring Plaintiff to produce a doctor's note from the issuing physician in order for any employee to return to work is company practice. ECF No. 51 at 5, ¶ 20. Plaintiff was returned to work the Monday after Defendant was alerted to the change in his doctor. *Id*. at 7, ¶ 27.

As related to the inconsistencies between the proffered reasons and other actions factor, Plaintiff offers a theory about TAW and disparate treatment, an argument that he never reported that performing work under the TAW safety course training aggravated his injury, and that it was not Wentler in a vacuum that decided to remove and keep Plaintiff off TAW, but instead was a group effort by management. ECF No. 54 at 14-15.

As to Plaintiff's TAW argument, the CBA is clear that it is to be applied on a nondiscriminatory basis for employees that are unable to perform their normal work due to on-the-job injuries. ECF No 49-4 at 13-14. Further, the agreement provides:

> Employees shall be provided their guaranteed hours with a start time no more than two (2) hours earlier or two (2) hours later than their normal start time for the duration of TAW, provided the work is available. The Company will make reasonable efforts to ensure that the assignment is within this window. These guaranteed hours will be reduced as medical restrictions dictate.

*Id*. at 14.

Plaintiff reads the TAW policy selectively, as it does say that hours are "guaranteed. However, it also states that the hours will be reduced depending on medical restrictions. Further, the hours are guaranteed within a certain window provided that the work "is available." At no point does the agreement state that employees are entitled to continue to use TAW time upon their return at their own discretion, nor does Plaintiff point to any section elsewhere which supports this proposition. ECF No. 49-4 at 13-14.

Plaintiff argues that he never reported neck pain while conducting paperwork related tasks on light duty to Manager Hopper. Taking this assertion in the light most favorable to Plaintiff, he has still not offered evidence sufficient to suggest a discriminatory motive behind his removal from paperwork-related TAW work and placement on "lost time." In notes from his alleged interview with Jesse Flamand in connection with an Ethics Concern, Plaintiff initially states that performing the paperwork related light work did cause him pain.[1] ECF No. 50-1 at 8. He then clarifies that his interaction with Manager Hopper was a miscommunication, and that he could have continued to perform the TAW work as assigned. *Id*. Further, Wentler confirms that Hopper spoke to him about the pain

[1] Plaintiff argues that this interview never occurred at all. ECF No. 54 at 14.

paperwork was causing Plaintiff. ECF No. 51 at 5, ¶ 14. Finally, Plaintiff does express that he noted to Manager Hopper that he briefly mentioned he was "sore," while he was under the light work TAW. ECF No. 57-4 at 10-11. Taking as true that Plaintiff never told Hopper that doing light work caused him pain, he has not offered any evidence that Wentler was motivated by his knowledge of the class action lawsuit or Plaintiff's military status in removing Plaintiff from the TAW.

Finally, Plaintiff argues that employees with worse physical impairments were allowed to remain on TAW for the maximum amount of time, and thus treatment by management was inconsistent. ECF No. 54 at 16-17. Plaintiff points to the fact that peers had recognized he was receiving disparate treatment, and that no other individual on a TAW had filed USERRA complaints. *Id.* at 17. Taking this information in the light most favorable to the Plaintiff, the Court has nothing but conclusory allegations to rely upon in rendering a decision. Plaintiff offers no information that any of the USERRA complaints, managers view that he was a "troublemaker," or knowledge of the class action lawsuit actually made their way to Wentler, the decisionmaker. Plaintiff's allegations are pure speculation. Plaintiff has not shown that any of the Spokane managers took an adverse employment decision against him based on his lawsuit.

a. <u>Cat's Paw Theory</u>

Plaintiff's theory that Fisher was ultimately pulling the strings to have

Plaintiff removed from TAW and denied a return to work fails for the same reasons as discussed above. Under a cat's paw theory, the animus of a non-decisionmaker may be imputed to a decisionmaker if the non-decisionmaker "sets in motion a proceeding by an independent decisionmaker that leads to an adverse employment action" and the termination therefore "was not actually independent because the biased subordinate influenced or was involved in the decision or decisionmaking process." *Poland v. Chertoff*, 494 F.3d 1174, 1182 (9th Cir. 2007); *see also Staub v. Proctor Hospital*, 562 U.S. 411, 421 (2011).

Plaintiff relies upon the fact that Fisher "knew of the class action lawsuit when Mr. Baker was removed from TAW," but his deposition testimony suggests that he did not learn of the lawsuit until after he had been placed on "lost time." ECF No. 54 at 19; ECF No. 54-5 at 5.[2] Even when viewed in the light most favorable to the Plaintiff, the Court cannot find that Fisher influenced any decision

---

[2] Plaintiff also alleges Fisher imposed his animus onto Wentler because Plaintiff had filed grievances and ethics complaints against him. ECF No. 54 at 19. To the extent that the accusation that Fisher was motivated to influence Wentler based on Plaintiff's internal complaints is relevant to this matter, rather than the punitive class action lawsuit, the Court does not find that Plaintiff has offered sufficient evidence to show that Fisher actually influenced a decision made by Wentler.

made because he had a personal issue with Plaintiff.

B. <u>WLAD</u>

Plaintiff has failed to produce a casual link between his removal from the TAW and initial denial of return to work, and his filing of the underlying class action lawsuit. Under the WLAD, "[i]t is an unfair practice for any employer ... to discharge, expel, or otherwise discriminate against any person because he or she has opposed any practices forbidden by this chapter." RCW 49.60.210(1). The provisions of the WLAD are to be construed liberally. RCW 49.60.020. In making a retaliation claim under WLAD, a plaintiff must first establish a prima facie case by showing "(1) the employee took a statutorily protected action, (2) the employee suffered an adverse employment action, and (3) a causal link between the employee's protected activity and the adverse employment action." *Cornwell v. Microsoft Corp*., 192 Wash. 2d 403, 411 (2018). If the plaintiff establishes a prima facie case, the burden shifts to the defendant who must "articulate a legitimate, nondiscriminatory reason for the adverse employment action." *Id*. (internal quotation and citation omitted). If the defendant meets this burden, the burden shifts back to the plaintiff to produce sufficient evidence that the defendant's reason was pretextual. *Id.*

To establish an adverse employment action, a plaintiff must show "a change in employment conditions that is more than an inconvenience or alteration of one's

job responsibilities, such as reducing an employee's workload and pay." *Alonso v. Qwest Comm's Co*., LLC, 178 Wash. App. 734, 746 (2013). To establish causation, a plaintiff must show that the retaliation was a "substantial factor" in the adverse employment action. *Allison v. Hous. Auth.,* 118 Wash. 2d 79, 81 (1991). Further, a plaintiff must demonstrate that the offending actor had actual knowledge of the protected activity or "suspected" the employee engaged in the suspected activity. *Cornwell*, 192 Wash. at 418. "Causation sufficient to establish the third element of the prima facie case may be inferred from circumstantial evidence, such as the employer's knowledge that the plaintiff engaged in protected activities and the proximity in time between the protected action and the allegedly retaliatory employment decision." *Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987).

Plaintiff has demonstrated he engaged in a statutorily protected activity in filing a lawsuit under USERRA. 38 U.S.C. § 4316(b)(1). And he has demonstrated that he experienced an adverse employment action, by his removal from TAW and initial denial of return to work, which would have caused him to lose pay for three days and then receive a reduced amount of 60% of his pay during the relevant period. ECF No, 54-1 at 12, ¶ 34. However, as discussed at length above, Plaintiff does not establish a connective link between the adverse action taken against him and the class action lawsuit he filed. Plaintiff offers his proximity in time and his disparate treatment regarding TAW arguments to support

his WLAD claim. *See generally* ECF No. 54 at 6-17. But Plaintiff does not support these arguments with a link from the filing of his class action lawsuit to retaliation carried out by Wentler such that it could be said he had actual knowledge or "suspected" Plaintiff had filed a lawsuit. For the same reasons as stated above, Plaintiff does not make a prima facia case as it relates to his WLAD claim, and therefore summary judgment is proper.

C. Statutory Damages

As the Court has determined that summary judgment is proper for the substantive claims, it declines to reach the merits of Plaintiff's argument for damages.

**ACCORDINGLY, IT IS HEREBY ORDERED:**

1. Defendant's Motion for Summary Judgment (ECF No. 47) is **GRANTED**.
2. Defendant's Motion to Strike is **DENIED as moot**.
3. The deadlines, hearings and trial date are **VACATED.**

The District Court Executive is directed to enter this Order, enter Judgment, furnish copies to counsel, and **CLOSE** the file.

DATED November 20, 2023.

THOMAS O. RICE
United States District Judge